**Tyrone Blackburn, ESQ**
**Attorney NYS-ID # 232602020**
**1242 East 80th Street, 3rd Floor**
**Brooklyn, NY 11236**
**(347) 342-7432**
*Attorney for Plaintiff Stephanie Jones*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

STEPHANIE JONES,

Plaintiff,

-against

FOX ROTHSCHILD LLP,
~~IAN W. SIMINOFF, and~~
~~ELLI ALBERT~~.

Defendants.

FIRST AMENDED
COMPLAINT
Civil Action No. 2:20-cv-06312-SDW-LDW

**JURY DEMANDED**

Plaintiff, Stephanie Jones ("Ms. Jones"), by and through her attorney, T.A. Blackburn Law, PLLC, now brings a series of claims against Defendants, Fox Rothschild LLP ("Fox"), ~~Ian W. Siminoff,~~ ~~("Siminoff"), and Elli Albert, ("Albert")~~ (hereinafter collectively referred to as, "Defendants"), of which the following is a statement:

### NATURE OF ACTION

1. This is an employment discrimination case that concerns the failure of Defendants to create, foster, and promote a work environment in which their female employees are not subjected to discrimination, harassment and intimidation because of their gender, and in which management employees respect the right of female employees to be free from discrimination, harassment and intimidation because of their gender.

2. At all times relevant to this action, Plaintiff Stephanie Jones was an employee of Defendants Fox, Siminoff, and Albert.

3. Defendants own, operate, and control a national law firm with its principal place of business located at 2000 Market St, 20th Floor, Philadelphia, Pennsylvania, 19103 under the name "Fox Rothschild LLP."

4. On information and belief, Siminoff serves or served as a Senior Attorney and agent of Fox, and through Fox operates or operated the law firm as a national enterprise.

5. On information and belief, Albert serves or served as an Office Manager and agent of Fox, and through Fox operates or operated the law firm as a national enterprise.

6. Defendants employed Ms. Jones as a Legal Administrative Assistant. Defendants have offices at 2000 Market St, 20th Floor, Philadelphia PA 19103; and 49 Market St, Morristown NJ 07960.

7. At all times relevant to this action, in violation of federal and state laws and regulations, Defendants created, fostered, promoted, and perpetuated policies and practices that resulted in the creation of a work environment ravaged with frequent, pervasive unwanted sexual comments, physical contact, advances, requests, and other similar conduct.

8. Ms. Jones brings this action according to Title VII of the Civil Rights Act of 1964 § 7, 42 U.S.C. § 2000e et seq (1964) ("Title VII"), the New Jersey Law Against Discrimination, and section 2A:14-2a(a)(1) of New Jersey P.L. 2019, c.120 (S477 SCS) ("N.J.P.L. 2019"), seeking all damages available at law and in equity under those statutes, including applicable liquidated damages, interest, attorneys' fees, and costs.

## JURISDICTION AND VENUE

9. This Court has original jurisdiction to hear this Complaint and adjudicate the claims stated herein under 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. §§ 2000d-2, 2000e-5(f), this action is brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000d and 2000e et seq., to redress and enjoin the discriminatory practices of defendants.  This Court has jurisdiction to hear Ms. Jones's state law claims under the N.J.P.L. 2019 according to the Court's exercise of supplemental jurisdiction under 28 U.S.C. § 1367.

10. The venue is proper in this District because of 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Ms. Jones's claims arose in this District.

11. Ms. Jones timely filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"), received a Notice of Right to Sue ("NRTS") from the EEOC, and has commenced this action within 90 days of receipt of the NRTS.

12. At all times relevant hereto, Defendants were employers within the meaning of Title VII and C.2A:14-2B and employed more than 500 persons.  The acts outlined in this Complaint were authorized, ordered, and done by defendants' officers, agents, employees, and representatives while actively engaged in the management and operation of the defendants' business.

## N.J. C.2A:14-2B: COMMENCEMENT OF ACTIONS REGARDLESS OF STATUTE OF LIMITATIONS

13. Each of Ms. Jones's causes of action is timely under New Jersey Statute C.2A:14-2B[1], which was enacted on May 13, 2019, and went into effect on December 1, 2019. Ms. Jones alleges that Siminoff committed intentional acts which resulted in Ms. Jones suffering physical, psychological, or other injuries or conditions as a direct and proximate result of conduct which constitutes a sexual offense committed against her person, as defined in Section 1 of P.L. 1992, c. 109, as amended on May 13, 2019[2].

---

[1]   https://trackbill.com/bill/new-jersey-senate-bill-477-extends-statute-of-limitations-in-civil-actions-for-sexual-abuse-claims-expands-categories-of-potential-defendants-in-civil-actions-creates-two-year-window-for-parties-to-bring-previously-time-barred-actions-based-on-sexual-abuse/1530372/

[2] Under New Jersey P.L. 2019, c.120 (S477 SCS), effective December 1, 2019, the statute of limitations for the claims detailed in this Complaint is seven years, with a two-year look back.

In relevant part, Section 2A:14-2b(1) states, every action at law for an injury resulting from the commission of a sexual assault or any other crime of a sexual nature against a person 18 years of age or older that occurred before, on, or after **the effective date of P.L.2019**, c.120 (C.2A:14-2a et al.) shall be commenced **within seven years** from the date of reasonable discovery of the injury and its causal relationship to the act.

Furthermore, Section 2A:14-2b-a states, **notwithstanding the statute of limitations provisions of N.J.S.2A:14-2**, section 2 of P.L.2019, c.120 (C.2A:14-2a) section 1 of P.L. 1964, c.214 (C.2A:14-2.1), or any other statute, an action at law for an injury resulting from the commission of the sexual assault, any other crime of a sexual nature, a prohibited sexual act as defined in section 2 of P.L.1992, c.7 (C.2A:30B-2), or sexual abuse as defined in section 1 of P.L.1992, c.109 (C.2A:61B-1), that occurred before the effective date of P.L.2019, c.120 (C.2A:14-2a et al.), and which action would otherwise be barred through the application of the statute of limitations, **may be commenced within two years immediately following the effective date**.

Additionally, Section C.2A:14-2b, titled "**Commencement of actions regardless of the statute of limitations**," states a follow:

a. **Notwithstanding the statute of limitations provisions of N.J.S.2A:14-2**, section 2 of P.L.2019, c.120 (C.2A:14-2a), section 1 of P.L.1964, c.214 (C.2A:14-2.1), **or any other statute, an action at law for an injury resulting from the commission of the sexual assault, any other crime of a sexual nature**, a prohibited sexual act as defined in section 2 of P.L.1992, c.7 (C.2A:30B-2), or sexual abuse as defined in section 1 of P.L.1992, c.109 (C.2A:61B-1), **that occurred before the effective date of P.L.2019**, c.120 (C.2A:14-2a et al.), **and which action would otherwise be barred through the application of the statute of limitations**, **may be commenced within two years immediately following the effective date**.

b. defined in section 1 of P.L.1992, c.109 (C.2A:61B-1) against either a minor under the age of 18 or a person 18 years of age or older.

14. This action was not filed until after the effective date of December 1, 2019.

15. New Jersey's sexual abuse statute specifically allows victims over eighteen (18) when the abuse occurred to file suits that would <u>otherwise be time-barred</u>. Specifically, under P.L. 2019c.120 (C.A:14-2a et al.), the statute of limitations is extended for sexual assault victims who were 18 years of age or older when the sexual abuse occurred.

16. On March 13, 2021, Judge Kevin McNulty, U.S.D.J for the District of New Jersey, published an opinion that examined the two years lookback window of New Jersey P.L. 2019, c.120 (S477 SCS), specifically, section 2A:14-2a(a)(1)[3]and its impact on the NJLAD. In Judge McNulty's decision, he held,

> "The state's personal-injury limitations period is two years. The acts complained of occurred some six years before this action was filed. Thus, Gavin's federal-law claims are time-barred.

> Gavin's state-law claims, however, <u>stand on different footing</u>. New Jersey is free to specify any limitations periods for causes of action under its law. Section 2A:14-2a(a)(1), the extended statute of limitations for claims based on sexual abuse of minors, applies to "<u>[e]very action</u> at law." Hence, it plainly encompasses all of Gavin's state-law claims. Accordingly, those are <u>not time-barred</u>."

17. In footnote 4, Judge McNulty directly addresses the "[n]otwithstanding" section of 2A:14-2a. Judge McNulty held,

> "Gavin cites another provision of the new law, providing that "[n]otwithstanding" section § 2A:14-2a, an action that is "otherwise" "barred" may be brought for two years after the legislation's effective date, December 1, 2019. N.J. Stat. Ann. § 2A:14-2b(a). He argues that his claims are timely because they fall within the two-year window starting on December 1, 2019. (Opp. at 3.) Gavin does not need to rely on this two-year window because, under section 2A:14-2a(a)(1), his claim is clearly not otherwise barred. Gavin is nowhere near 55 years old. <u>This catchall provision is designed to assist sexual assault survivors who are over 55 and therefore could not take advantage of the newly extended limitations period</u>. S. Judiciary Comm., Statement to Senate Committee Substitute for Senate, No. 477, S. 477, 218th Sess., at 7 (N.J. 2019)."

---

Finally, Section C.2A:14-2c, titled "<u>**Effective date**</u>,"
**The provisions of this amendatory and supplementary act, P.L.2019, c.120 (C.2A:14-2a et al.), shall take effect on December 1, 2019**. These provisions shall be inapplicable to any civil action governed solely by the statute of limitations of another jurisdiction.

[3] Plaintiff briefed the court on Section 2A:14-2a(a)(1) of New Jersey P.L. 2019, c.120 (S477 SCS).

## PUBLIC POLICY IMPLICATIONS OF N.J.S.2A:14-2
## TWO (2) YEAR "FILING WINDOW"

18. On March 7, 2019, New Jersey Senate Judiciary Committee issued the following statement

regarding Senate Bill No. 477 (N.J.S.2A:14-2):

> "The  Senate Judiciary   Committee reports favorably a Senate Committee Substitute for Senate Bill No. 477. This substitute bill *would extend the statute of limitations in civil actions for sexual abuse claims*, as well as *create a two-year window for parties to bring <u>previously time-barred</u> actions based on sexual abuse*. The bill would also expand the categories of potential defendants in civil actions, and for some actions, permit retroactive application of standards of liability to past acts of abuse for which liability did not previously exist. The following section-by-section summary of the bill's provisions further details its scope and application to lawsuits which could be filed beginning on December 1, 2019, the bill's effective date."

19. On March 26, 2019, New Jersey Senate issued the following synopsis in Senate Committee

Substitute for Senate, No. 477:

> "Extends statute of limitations in civil actions for sexual abuse claims; expands categories of potential defendants in civil actions; creates a two-year window for parties to bring previously time-barred actions based on sexual abuse."

20. On May 13, 2019, New Jersey Governor Philip D. Murphy said the following:

> "Today I am signing Senate Committee Substitute for Senate Bill No. 477. Which significantly extends the statute of limitations for sexual abuse claims and creates a two-year filing window for sexual abuse claims that would otherwise be time-barred by the statute of limitations that goes into effect upon the bill's enactment… I cannot deny victims the ability to seek redress in Court for sexual abuse that often leaves trauma lasting a lifetime. I am confident that our judicial system is the right forum to assess these claims fairly and impartially."

## <u>PARTIES</u>
### *Plaintiff*

21. Ms. Jones is an adult individual over the age of fifty (50) residing in California. She was

employed by Defendants from on or about May 7, 1990, until June 21, 2017, when she was

terminated.

### *Defendants*

22. Fox is a domestic limited liability partnership organized and existing under the laws of the

Commonwealth of Pennsylvania with its principal place of business at 2000 Market St,

20th Floor, Philadelphia PA 19103.

23. Fox also maintained offices at 49 Market St, Morristown, NJ, 07960 (hereinafter "the NJ office").

24. ~~Siminoff is an individual engaging (or engaged) in business in this judicial District during the relevant period.  Siminoff is sued individually in his capacity as a Senior Associate and agent of Fox.~~

25. ~~On information and belief, Siminoff controls significant functions of Fox.  He determines the work assignments and conducts performance reviews of Fox employees, including Ms. Jones, establishes their schedules, and has the authority to impact the hiring and firing of employees.~~

26. ~~During the relevant period, Albert is an individual engaging (or has engaged) in business in this judicial District.  Albert is sued individually in her capacity as an Office Manager and agent of Fox.~~

27. ~~On information and belief, Albert controls significant functions of Fox.  She determines the work assignments and conducts performance reviews of Fox employees, including Ms. Jones, establishes their schedules, and has the authority to impact the hiring and firing of employees.~~

## **FACTUAL ALLEGATIONS**

28. On or about May 7, 1990, Ms. Jones joined Grotta, Glassman & Hoffman PA as a librarian in Roseland, New Jersey.

29. On October 1, 2006, Grotta, Glassman & Hoffman merged into Fox.  After the merger, Ms. Jones transitioned into the role of a paralegal.

30. In January 2007, Ms. Jones began working as a multi-area paralegal in the Roseland office, focusing on litigation, labor & employment, and family law, and working with attorneys Matthew Adams, Ernest Badway, Kenneth Rosenberg, Siminoff, Mark Tabakaman, Robert Epstein, and others.

31. In January 2008, Ms. Jones was assigned to work with Siminoff and the Labor & Employment department.

32. Siminoff was difficult and demanding and had issues with many staff members at that time. Siminoff worked for Michael Barabander.  Ms. Jones filed multiple complaints about Siminoff's behavior with then Office Administrator Jackie Pampinella.

33. In July 2013, Ms. Jones transitioned into the role of Legal Administrative Assistant to Michael Barabander.

34. Kenneth Rosenberg, Robert Epstein, and Mark Tabakman, all partners with Fox Rothschild who had experience working with Michael Barabander, warned Ms. Jones not to take the job because Michael Barabander was "insane," "horrible," and the like.

35. From 2013 through 2015, in addition to supporting Michael Barbander, Ms. Jones also assisted attorneys Patricia McManus, Yalda Haery, Courtney Roach, and Justin Schwam.

36. Theresa Borzelli, a Partner at Fox Rothschild, informed Ms. Jones that Siminoff had been removed from Michael Barabander's team because he was instrumental in losing Hackensack Hospital, a long-time client of Michael Barbander's, due to his conflict with the client. The resulting resentment between the two men set the stage for Siminoff's predatory behavior towards Barabander's assistant, Ms. Jones.

### *Siminoff's Oral Sex Inquiry at McLoone's Boat House*

37. In January 2014, Siminoff invited Ms. Jones to have drinks after work at McLoone's Boat House in West Orange, NJ, to talk about Michael Barabander and supposedly to help her navigate the new position.

38. Ms. Jones accepted Siminoff's offer. At the time, Siminoff was married, and Ms. Jones was in the midst of a divorce. Ms. Jones believed Siminoff to be straightforward regarding this invitation, given his experience with Barabander. They discussed work and personalities at work for the first 45 to 60 minutes. While drinking the second glass of wine, Siminoff asked Ms. Jones if she enjoyed oral sex. Ms. Jones immediately ended the conversation and left.

### *Beginning in January 2014, Siminoff began sending*
### *Ms. Jones sexually explicit text messages*

39. Soon after asking her about oral sex at McLoone's Boat House, Siminoff told Ms. Jones he was unhappy in his marriage and began sending her sexually explicit text messages that focused on several topics, including Ms. Jones's sex life, what she liked regarding sex, and what her sexual fantasies were. His sexually explicit text messages even extended to the color of her underwear.

40. Siminoff served as Ms. Jones's direct supervisor whenever his assistant, Marlene Mascolo, was out of the office. On those occasions, he would request that Ms. Jones come into his

office for many reasons.  She resisted whenever she could, but Siminoff would demand that she print documents and bring them to him.

### *Siminoff fondled Ms. Jones's breasts*

41. On one occasion, while in Siminoff's office, he closed the door and fondled Ms. Jones's breasts.  Ms. Jones pushed him off, told him to stop, and left his office.

42. Siminoff's attacks on Ms. Jones extended beyond the breast fondling attack in his office. He would stop by Ms. Jones's desk and attempt to fondle her breasts and body through her clothes.

### *Siminoff grabbed Ms. Jones's vagina*

43. On one occasion, when both were at the coffee machine, Siminoff put his hands under Ms. Jones' dress and grabbed at her vagina.

44. Ms. Jones never touched Siminoff.  Instead, she kept him at arm's length to the extent she could.

45. Ms. Jones is not a physical match for Siminoff, a former soldier in the Israeli army. Siminoff is 6'5" tall and weighs over 230 pounds.  He works out consistently and brags about his physicality.  On the other hand, Ms. Jones is 5'3" tall and weighs 120 pounds.

### *Ms. Jones complained to Office Manager Elli Albert about Siminoff's behavior*

46. In August of 2014, Ms. Jones approached Elli Albert, Office Administrator in the NJ office, and asked her to remove her from the rotation of Siminoffs desk.  Albert denied Ms. Jones's request.

47. Ms. Jones protested and informed Albert that Siminoff made her feel uncomfortable and was inappropriate and rude.

48. Albert was unrelenting in her denial of Ms. Jones's request and told Ms. Jones that she should look for another job if she was unhappy at Fox.  Albert told her there were "plenty of other places to work."

### *Siminoff attempted to rape Ms. Jones*

49. On or about April 2017, after 5:30 PM, during the workweek, Ms. Jones found herself nearly alone on the 4th floor of the NJ office with Siminoff.  During this encounter, Siminoff pushed Ms. Jones into a deserted bathroom and tried to have sexual intercourse with her.  Siminoff made skin-to-skin contact with Ms. Jones.

50. Ms. Jones fought off Siminoff's sexual assault.

### *Siminoff's sexually harassing text messages to Ms. Jones*

51. From March 30, 2017, through July 12, 2017, Siminoff sent over 100 unsolicited sexually harassing text messages to Ms. Jones, some of which are set forth herein, some of which were sent by Siminoff when he was working out of the NY office defending or taking depositions and some of which included photographs of his penis:

    a. On March 30, 2017, at 6:34: 16 PM, Ms. Jones received the following text message from Siminoff: "How's the boyfriend? We should fuck in MB[4]'s office."

    b. On March 30, 2017, at 7:32:24 PM, Ms. Jones received the following text message from Siminoff: "Ever told you look like Cindy Crawford?"

    c. On March 31, 2017, at 12:38:04 AM, Ms. Jones received the following text message from Siminoff: "What's it like to be told you look like Cindy Crawford, a supermodel?"

    d. On March 31, 2017, at 1:08:15 AM, Ms. Jones received the following text message from Siminoff: "It has to give you confidence, in terms of sex appeal."

    e. On March 31, 2017, at 1: 15:06 AM, Ms. Jones received the following text message from Siminoff: "Understand. Don't mind me, I'm just laying here at 3 AM thinking about kissing your breasts".

    f. On April 1, 2017, at 6:48:04 PM, Ms. Jones received the following text message from Siminoff: "What are you wearing?"

    g. On April 1, 2017, at 7:47: 10 PM, Ms. Jones received the following text message from Siminoff: "I'd like to pour that glass of wine on your naked body."

    h. On April 1, 2017, at 7:59:07 PM, Ms. Jones received the following text message from Siminoff: "Even better than drinking it."

    i. On April 1, 2017, at 8: 16:39 PM, Ms. Jones received the following text message from Siminoff: "As I see it, it trickles down your breasts, in between them, to in between your legs."

---

[4] "MB" stands for Michael Barabander

j. On April 4, 2017, at 10:55:13 PM, Ms. Jones received the following text message from Siminoff: "Speaking of well behaved, what color panties and bra were you wearing today?"

k. On April 5, 2017, at 2:40:44 PM, Ms. Jones received the following text message from Siminoff: "I said a prayer this morning that the warm weather will bring on your "bad" behavior."

l. On April 7, 2017, at 4:27:26 PM, Ms. Jones received the following text message from Siminoff: "I had a nice bird's eye view of your breasts today while talking to you."

m. On April 10, 2017, at 10:40:28 AM, Ms. Jones received the following text message from Siminoff: "You look hot."

n. On April 10, 2017, at 11:21:23 AM, Ms. Jones received the following text message from Siminoff: "Great dreams about you last night."

o. On April 29, 2017, at 4:34:38 PM, Ms. Jones received the following text message from Siminoff: "We could have had some dep break fun if you were there."

p. On May 2, 2017, at 6:20:42 AM, Ms. Jones received the following text message from Siminoff: "Dreams about you last night. I always cum when I think of you!"

q. On May 2, 2017, at 6:27:24 AM, Ms. Jones received the following text message from Siminoff: "I'll share with you later what they were .... "

r. On May 2, 2017, at 11 :57: 17 AM, Ms. Jones received the following text message from Siminoff: "Love your shirt."

s. On May 2, 2017, at 12:07:59 PM, Ms. Jones received the following text message from Siminoff: "Because it accentuates your breasts."

t. On May 2, 2017, at 8:29:59 PM, Ms. Jones received the following text message from Siminoff: "What are you wearing?"

u. On May 3, 2017, at 7:47:32 PM, Ms. Jones received the following text message from Siminoff: "I'd lie if I said I wasn't curious as to what you are wearing."

v. On May 3, 2017, at 8:09:53 PM, Ms. Jones received the following text message from Siminoff: "Will I have to wonder?"

w. On May 4, 2017, at 7:55:09 PM, Ms. Jones received the following text message from Siminoff: "Do your friends know you have a younger attorney in the office infatuated by you?"

x. On May 5, 2017, at 12:44:30 PM, Ms. Jones received the following text message from Siminoff: "Filthy. I'd love to get filthy with you Steph".

y. On May 5, 2017, at 1:03:50 PM, Ms. Jones received the following text message from Siminoff: "Great boobs. Is that a one piece?"

z. On May 8, 2017, at 4:58:46 PM, Ms. Jones received the following text message from Siminoff: "These NY women have nothing on you" .... at 5:08:12 PM "But you already know that ... "

aa. On May 8, 2017, at 5:36:26 PM, Ms. Jones received the following text message from Siminoff: "My hotel's got a rooftop bar."

bb. On May 8, 2017, at 5:37:23 PM, Ms. Jones received the following text message from Siminoff: "We'll see if I'll show up for tomorrow's dep."

cc. On May 9, 2017, at 3:59:34 PM, Ms. Jones received the following text message from Siminoff: "Just talked to my friend from Louisville ky. He reminds me that as weird as i am he's weirder. And he's a surgeon".

dd. On May 17, 2017, at 7:46:58 PM, Ms. Jones received the following text message from Siminoff: "I'm doing what I usually do when I think of you."

ee. On May 17, 2017, at 8: 15:28 PM, Ms. Jones received the following text message from Siminoff: "Do you mean thinking of me while you play with your pussy?"

ff. On May 18, 2017, at 5:45:09 AM, Ms. Jones received the following text message from Siminoff: "One of the sexiest things about you is your confidence and your knowledge that you're good looking."

gg. On May 20, 2017, at 7:35:05 AM, Ms. Jones received the following text message from Siminoff: "I had dreams of baby blue last night."

hh. On May 20, 2017, at 7:39:56 AM, Ms. Jones received the following text message from Siminoff: "As in your powder blue one-piece dress."

ii. On May 20, 2017, at 7:55:49 AJVI, Ms. Jones received the following text message from Siminoff: "Oh yeah. My mind (as is yours) is a very powerful tool. You enjoyed yourself in my dream".

jj. On May 20, 2017, at 8: 18: 17 AM, Ms. Jones received the following text message from Siminoff: "Let me know if you want to know how I did you in my dream, too."

kk. On May 20, 2017, at 12:06:45 PM, Ms. Jones received the following text message from Siminoff: "There are, as you might imagine, some intriguing details."

ll. On May 23, 2017, at 7: 10:23 PM, Ms. Jones received the following text message from Siminoff: "Mmmm. Of course, who knows where kissing would lead ... "

mm.      On May 23, 2017, at 7: 19:27 PM, Ms. Jones received the following text message from Siminoff: "I suppose there is the possibility, mind you, just a possibility, that kissing could lead to me doing you from behind?"

nn. On May 23, 2017, at 7:53: 12 PM, Ms. Jones received the following text message from Siminoff: "Can I share with you the assist you gave me over the weekend? Share something else?"

oo. On May 23, 2017, at 8:07:53 PM, Ms. Jones received the following text message from Siminoff: "The assist was three-fold."

pp. On May 23, 2017, at 8: 10: 16 PM, Ms. Jones received the following text message from Siminoff: "Three different images, one after the other: 1) you spitting my cum into my ex's hair; 2) you inserting veggies into her ass, and 3) you fucking Andy while I was sleeping".

qq. On May 23, 2017, at 8:12: 14 PM, Ms. Jones received the following text message from Siminoff: "Yes. Your favorite of the 3?"

rr. On May 25, 2017, at 6:31:34 PM, Ms. Jones received the following text message from Siminoff: "There's not much better in this world than you in a top with a plunging neckline."

ss. On May 25, 2017, at 6:57:26 PM, Ms. Jones received the following text message from Siminoff: "The men who have had the good fortune of being your romantic and or sexual partner must feel so blessed."

tt. On May 25, 2017, at 8:40:53 PM, Ms. Jones received the following text message from Siminoff: "Did you catch me looking at your breasts last night/today?"

uu. On May 25, 2017, at 9: 10:50 PM, Ms. Jones received the following text message from Siminoff: "But please share, who is the object of your sex fantasies? 33?"

vv. On May 30, 2017, at 12: 11: 11 PM, Ms. Jones received the following text message from Siminoff: "In deps .... hi" .... at 2:43:47 PM, Ms. Jones received the following text message from Siminoff: "Ooh la la. Panties?"

ww.    On May 30, 2017, at 8:58: 15 PM, Ms. Jones received the following text message from Siminoff: "And even took a new pie this evening." The text message included a photograph of Siminoff's penis.  (**Exhibit D**)

xx. On June 1, 2017, at 9:50:56 PM, Ms. Jones received the following text message from Siminoff: "I know you're a visual person .. do you want a visual?"

yy. On June 1, 2017, at 9:52:44 PM, Ms. Jones received the following text message from Siminoff: "Sure. If you remember, can you imagine what it would be like for me now to put myself inside you?"

zz. On June 13, 2017, at 8: 17:27 AM, Ms. Jones received the following text message from Siminoff: "I've been a very good boy, so I should be abyss-free! But I'd love to send you another pie of my cock".

aaa.    On June 13, 2017, at 2:35:27 PM, Ms. Jones received the following text message from Siminoff: "Might I ask how old your most fortunate gentleman suitor is?"

52. Periodically Ms. Jones blocked Siminoffs text messages, which he referred to as being in the "abyss."  When she did so, Siminoff continually sent her harassing emails and texts requesting to be made "abyss-free," some of which are set forth herein:

    a. On April 17, 2017, at 12:04 PM, Ms. Jones received an email on her Fox Rothschild email account from Siminoff titled "Please accept this as a formal de-abyssment request. Thanks!"

    b. On April 18, 2017, at 5:00 PM, Ms. Jones received an email on her Fox Rothschild email account from Siminoff titled "Abyss-free spring." The body of the email had the following: "Re the next casual Friday, I will be wearing at-shirt with the above phrase emblazoned."

    c. On April 19, 2017, at 1:37 PM, Ms. Jones received an email on her Fox Rothschild email account from Siminoff titled "Abyss removal update." The body of the email had the following: "Hi- just checking in."

d.  On April 19, 2017, at 2:00 PM, Ms. Jones received an email on her Fox Rothschild email account from Siminoff titled "Abyss removal update." The body of the email had the following: "I can't hear from you? What did you say?".

e.  On April 19, 2017, at 2:02 PM, Ms. Jones received an email on her Fox Rothschild email account from Siminoff titled "Abyss removal update." The body of the email had the following: "Did you hear that? DO YOU HAVE AN ABYSS REMOVAL UPDATE?".

f.  On April 24, 2017, at 10:49:00 AM, Ms. Jones received the following text message from Siminoff: "Ah, to be out of the abyss .... so refreshing".

g.  On June 13, 2017, at 9:27 AM, Ms. Jones received an email from Siminoff titled "Good morning." The body of the email says the following: "Hope all is well and cheers to an abyss-free June!!".

h.  On June 13, 2017, at 8: 17:27 AM, Ms. Jones received the following text message from Siminoff: "Abyss-free?".

### *Jones was also sexually harassed by Michael Barabander, a Partner at Fox*

53. On February 3, 2016, at 5:48 PM, Ms. Jones sent officer manager Elli Albert an email titled "Today."   Ms. Jones addressed several incidents of abusive, humiliating, harassing behavior exhibited by Michael Barabader.   Ms. Jones raised the issue of Michael Barabander consistently singing "Me and Mrs. Jones," a sexually suggestive song about an illicit affair. (**Exhibit A**).  Barabander was notable in that he consistently preferred working with attractive younger women, both attorneys and support staff, and was known to be a bully and difficult to work with and for.  Barabander's eminence as a 'rainmaker' caused the Firm to turn a blind-eye to his behavior.

### *Albert is an aider and abettor of predatory behavior*

54. On February 3, 2016, at 5:54 PM, *seven (7) minutes* after receiving Ms. Jones's Complaint regarding Barabanders harassment, Albert sent an email to Barabander[5] warning him of Ms. Jones's Complaint. (**Exhibit B**).

---

[5] Via Barabander's g-mail account, mbarabander@gmail.com.

55. On February 3, 2016, at 7:59 PM, Albert said the following, "I think no meeting or apology, as I don't want her[6] aware that I shared the comments.  I just wanted you to know to avoid humor with her as it seems she is easily offended."  Albert continues, "As to the other issue, she is interpreting your comments in a way that suits her."

56. On February 4, 2016, at 8:54 AM, Albert acknowledged receipt of Ms. Jones's February 3 email and offered to speak with Barabander about his actions.   Albert failed to mention that she informed, strategized, and colluded with Barabander regarding Ms. Jones's Complaint the night before.

57. On February 4, 2016, at 10:32 AM, Ms. Jones raised concerns of retaliation from Michael Barabander.

58. Two weeks later, on February 17, 2016, at 4:50 PM, Albert provides Barabander with the following warning, "Be careful not to use Fox account for these emails."  As was the case on February 3, 2016, Barabander communicated with Albert via his g-mail account. (**Exhibit C**).

### *Stephanie Jones Complains to Albert about Siminoff's predatory behavior*

59. On December 22, 2016, at 4:49 PM, Ms. Jones sent the following email to Albert, "Let me know when we can speak."

60. Minutes after sending the 4:49 PM email, Ms. Jones saw Albert in the hallway and was invited into her office. Ms. Jones and Albert had a conversation that lasted approximately 10 minutes.

61. On December 22, 2016, Ms. Jones memorialized the conversation with Albert on a handwritten note, on a "print job sheet" with Job # 2084, dated: 12/22/2016, and time-stamped: 5:01:39 PM.

62. Ms. Jones handwritten note states as follows:

> "Tried to speak to Elli about Ian being inappropriate to me, and she didn't seem to make much of what I told her.  Said she would have one of the male attorneys speak to him to get his side. Told me to keep arm's length, not to put in emails (again), too sensitive."

---

[6] Referring to Ms. Jones.

***Albert and Cummings-Judge referred to Ms. Jones's***
***Sexual Harassment complaint as a "great imagination"***

63. On or about late May to early June 2017, Ms. Jones informed Albert that Siminoff's harassment was becoming unrelenting and excessive.  Albert warned Jones not to place her concerns in writing and come to Albert to discuss all of her concerns.

64. Upon information and belief, a few weeks later, Albert and Kathleen Cummings-Judge[7] presented a performance improvement plan ("PIP"). During this meeting, Ms. Jones protested the PIP and classified the act as a "set up."  Ms. Jones restated her concerns surrounding the harassment she experienced with Siminoff and Barabander. Cummings-Judge consistently interrupted Ms. Jones and accused her of having a "great imagination."

***Fox Rothschild has a sham system for reporting sexual harassment***

65. As a representative of Fox, Albert *did not comply* with the policies and procedures contained in Fox's "Administrative Staff Handbook" dated March 2015.  For example, Albert did not complete an investigation of Ms. Jones's harassment complaint.  She did not communicate a summary of her findings and intended actions to Ms. Jones.  She did not maintain a written summary of whatever investigation she did conduct in a confidential file.

66. Albert and Siminoff control significant functions of the NJ office.

67. Fox, Albert, and Siminoff possessed and exercised substantial control over Ms. Jones's working conditions and the policies and practices that governed her employment and compensation.

68. Fox, Albert, and Siminoff are Ms. Jones's joint employers within the meaning of Title VII, the NJLAD, and the N.J.P.L. 2019.

69. Fox has a pattern and practice of violating the rights of its female employees and protecting their male harassers.  On information and belief, Fox previously was cited for similar violations of federal and state employment laws for protecting N. Ari Weisbrot, a former Partner at Fox, who was accused by several female attorneys of sexual harassment and sex discrimination and was forced to resign in 2017 after an internal investigation into the allegations.

---

[7] Human Resource Representative seated in Philadelphia.

***Fox Rothschild was provided <u>two photos of Siminoff's penis</u> on March 6, 2019***

70. On or about March 6, 2019, Ms. Jones participated in an EEOC mediation with Defendant Corporation.

71. At that March 6, 2019, EEOC mediation, Defendant Fox was represented by their Assistant General Counsel, Rachelle M. Bin, and Partner, Wayne Pinkstone.

72. On or about March 6, 2019, Defendant Fox was provided with a synopsis of the text messages Siminoff sent to Ms. Jones.

73. On or about March 6, 2019, Defendant Fox was provided with two (2) copies of a photo of Siminoffs penis. A photo that Siminoff sent to Ms. Jones.

74. On or about March 6, 2019, both parties agreed to participate in limited pre-litigation discovery at the close of the EEOC mediation.  The agreement was simple, within seven days, Ms. Jones and Siminoff would turn over their cellphones to a neutral third-party Cellphone Forensics company and have all of their communications (text messages, photos, videos, screenshots, etc.) extracted.

75. Ms. Jones was prepared to turn over her cellphone within 24 hours.

76. On or about March 28, 2019, 22 days after the mediation, Wayne Pinkstone informed the EEOC that Siminoff's cellphone was "wiped clean."  When pressed on who instructed Siminoff to wipe his cellphone clean, Wayne Pinkstone said it was wiped clean at the direction of Fox.

77. When asked when the phone was wiped clean, Wayne Pinkstone first said it was wiped clean in the fall of 2017.  After it was disclosed that Fox was served with a preservation notice in the fall of 2017, Wayne Pinkstone retracted his statement.  He said Siminoff wiped his phone clean before Ms. Jones's termination.  When it was disclosed that Defendant Siminoff text messaged Ms. Jones weeks after her termination, Wayne Pinkstone ran out of explanations.

78. On or about March 28, 2019, after Fox disclosed their spoliation of crucial evidence, Ms. Jones insisted on living up to her end of the agreement and turned over two cellphones to Cellphone Forensic company, Eide Bailly, and had all communications between herself and Siminoff extracted.

79. On or about May 9, 2019, Defendant Fox paid Eide Bailly $412.50 for this process.

80. On or about May 20, 2019, after the process was completed, Eide Bailly provided Fox with an affidavit and over 50 pages of text message communications between Ms. Jones and Siminoff.

81. On or about May 20, 2019, to December 18, 2019, after receiving evidence of Siminoff's sexual harassment, Tom Paradise and Fox made a conscious decision to place profits over people by negligently exposing other women within their firm to Siminoff's criminal and predatory behavior.  In fact, Ms. Jones began to defend herself as early as August 2017 with the assistance of Maria R. Lupino, Esq. (Law Offices of Rosemarie Arnold), when conversations with Fox first began.

### Count I
### *Title VII of the Civil Rights Act of 1964, as Amended*
### *(against Defendant Fox Rothschild LLP)*

82. Plaintiff incorporates herein by reference as if outlined in full the averments of paragraphs 1-81, inclusive, of this Complaint.

83. Defendants discriminated against Ms. Jones in connection with the terms, conditions, and privileges of her employment because of her gender.  They retaliated against her in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq.

84. Defendants' conduct was intentional, willful, deliberate, and in callous disregard of Ms. Jones's rights.

85. Because of the defendants' discrimination and retaliation, Ms. Jones is entitled to all legal and equitable remedies available under Title VII.

### ~~Count II~~
### *~~Section 2A:14-2a(a)(1) of New Jersey P.L. 2019, c.120 (S477 SCS)~~*
### *~~N.J.S.2A:14-2B (Sex Crimes)~~*
### *~~(against Defendant Ian W. Siminoff)~~*

86. ~~Plaintiff incorporates herein by reference as if outlined in full the averments of paragraphs 1-85, inclusive, of this Complaint.~~

87. ~~Siminoff fondled Ms. Jones's breast and grabbed her vagina in a harmful and offensive manner.~~

88. ~~Siminoff fondled Ms. Jones's breast and grabbed her vagina without privilege or consent from Ms. Jones.~~

89. Siminoff attempted to rape Ms. Jones and made skin-to-skin contact in the process.

90. As a result of the preceding, Ms. Jones sustained, among other things, assault, battery, severe emotional distress, embarrassment, humiliation, physical pain, and mental anguish, together with shock, fright, and apprehension.

91. Because of Siminoffs' multiple assaults, Ms. Jones is entitled to all legal and equitable remedies available under N.J.S.2A:14-2B, the NJLAD, and section 2A:14-2a(a)(1) of New Jersey P.L. 2019, c.120 (S477 SCS).

### Count III
### Section 2A:14-2a(a)(1) of New Jersey P.L. 2019, c.120 (S477 SCS)
### Violation of the Pierce Doctrine
### (against Defendant Fox Rothschild)
### Wrongful Termination in Retaliation
### for raising a claim of sexual harassment against Defendant Siminoff

92. Plaintiff incorporates herein by reference as if outlined in full the averments of paragraphs 1-91, inclusive, of this Complaint.

93. In Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58, 72, 417 A.2d 505 (1980), the New Jersey Supreme Court held that "an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy." As sources of public policy, the Court listed "legislation; administrative rules, regulations or decisions; and judicial decisions." *Id.*

94. "To establish a case for common law wrongful discharge, the employee must identify the clear mandate of public policy and that the discharge itself was in violation of that public policy." Hargrave v. County of Atlantic, 262 F. Supp. 2d 393, 431 (D.N.J. 2003).

95. Ms. Jones was employed by Defendant Fox, giving rise to a duty not to discharge Ms. Jones in violation of public policy and/or an implied covenant of good faith and fair dealing; and defendant breached its duty and the implied covenant when it discharged Ms. Jones in retaliation for raising claims of Sexual harassment. Ms. Jones complaints constituted a violation of the following criminal statutes:

    a. Harassment in violation of: N.J.S.A. § 2C:33-4,
    b. Lewdness in violation of: N.J.S.A. § 2C:14-4,
    c. Simple Assault: N.J.S.A. 2C:12-1a (1),
    d. Attempt: N.J.S.A. 2C:5-1, and
    e. Criminal Sexual Contact: N.J.S.A. 2C:14-3b [2C:14-2c(1) through (4)].

96. Elli Albert and Fox Rothschild violated the Pierce Doctrine when they terminated Ms. Jones after she made several complaints of sexual harassment in the workplace by Barabander and Siminoff.

97. As previously stated in paragraphs 51-62 above, Ms. Jones complained to Elli Albert and Kathleen Cummings-Judge about Barabander and Siminoff's relentless sexual harassment. Albert and Cummings-Judge accused Ms. Jones of having a "great imagination."

98. Albert conspired with Barabander to cover up his actions and warned Ms. Jones not to place her complaints about Siminoff in an email.

99. Albert and Cummings-Judge disregarded Ms. Jones's Complaint that Siminoff pushed Ms. Jones into a deserted bathroom and tried to have sexual intercourse with her.  During this attempted rape, Siminoff made skin-to-skin contact.

100.        Albert and Cummings-Judge disregarded the fact that Siminoff intentionally attempted and threatened to inflict physical and emotional injury on Ms. Jones with the ability to cause such harm, and which created a reasonable apprehension of bodily harm and offensive contact in Ms. Jones.

101.        Albert and Cummings-Judge disregarded the injuries and damages Ms. Jones experienced at the hands of Siminoff.

102.        Because of Siminoffs' multiple sexual assaults and Albert and Fox's retaliatory termination, Ms. Jones is entitled to all legal and equitable remedies available under N.J.S.2A:14-2B, the NJLAD, and section 2A:14-2a(a)(1) of New Jersey P.L. 2019, c.120 (S477 SCS).

**Count IV**
***Section 2A:14-2a(a)(1) of New Jersey P.L. 2019, c.120 (S477 SCS)***
***Sexual Harassment (Sexting)***
***(against Defendant Ian W. Siminoff)***

103.        Plaintiff incorporates herein by reference as if outlined in full the averments of paragraphs 1-102, inclusive, of this Complaint.

104.        Sexting is the act of sending or receiving nude or sexually explicit images or videos through an electronic device such as a phone or computer.

105.        By sexting multiple unsolicited pictures of his penis from his cellphone to Ms. Jones's cellphone, Siminoff violated New Jersey sexting statute.

106.      Siminoff sexted several unsolicited photos of his penis to Ms. Jones's cellphone without privilege or consent from Ms. Jones.

107.      Siminoff continued to sext several unsolicited photos of his penis from his cellphone to Ms. Jones's cellphone after Ms. Jones explicitly asked him to refrain from doing so on multiple occasions.

108.      By way of example, On June 13, 2017, at 8:17:27 AM, Ms. Jones received the following text message from Siminoff: "I've been a very good boy, so I should be abyss-free! But I'd love to send you another pic of my cock."

109.      As a result of the preceding, Ms. Jones sustained, among other things, severe emotional distress, embarrassment, humiliation, physical pain, and mental anguish, together with shock, fright, and apprehension.

110.      Because of Siminoffs' multiple acts of sexting, Ms. Jones is entitled to all legal and equitable remedies available under N.J.S.2A:14-2B, the NJLAD, and section 2A:14-2a(a)(1) of New Jersey P.L. 2019, c.120 (S477 SCS).

**Count V**
**Section 2A:14-2a(a)(1) of New Jersey P.L. 2019, c.120 (S477 SCS)**
**Intentional Infliction of Emotional Distress (Lewdness)**
**(against Defendant Ian W. Siminoff)**

111.      Plaintiff incorporates herein by reference as if outlined in full the averments of paragraphs 1-110, inclusive, of this Complaint.

112.      Lewdness is New Jersey's indecent exposure statute and could apply to sending nude pictures of one's genitalia to anyone who does not consent.

113.      By sexting multiple unsolicited pictures of his penis from his cellphone to Ms. Jones's cellphone, Siminoff violated New Jersey lewdness statute.

114.      Siminoff sexted several photos of his penis to Ms. Jones's cellphone without privilege or consent from Ms. Jones.

115.      Siminoff continued to sext several unsolicited photos of his penis from his cellphone to Ms. Jones's cellphone after Ms. Jones explicitly asked him to refrain from doing so on multiple occasions.

116.      By way of example, On May 30, 2017, at 8:58:15 PM, Ms. Jones received the following text message from Siminoff: "And even took a new pie this evening." The text

message included a photograph of Siminoff's penis. (**Exhibit D, a Penis Photo Siminoff sent to Ms. Jones**).

117.  On June 1, 2017, at 9:50:56 PM, Ms. Jones received the following text message from Siminoff: "I know you're a visual person .. do you want a visual?" (referring to a visual of his penis).

118.  On June 1, 2017, at 9:52:44 PM, Ms. Jones received the following text message from Siminoff: "Sure. If you remember, can you imagine what it would be like for me now to put myself inside you?" (Siminoff was referring to putting his penis inside of Ms. Jones).

119.  As a result of the preceding, Ms. Jones sustained, among other things, severe emotional distress, embarrassment, humiliation, physical pain, and mental anguish, together with shock, fright, and apprehension.

120.  Because of Siminoffs' multiple acts of Lewdness, Ms. Jones is entitled to all legal and equitable remedies available under N.J.S.2A:14-2B, the NJLAD, and section 2A:14-2a(a)(1) of New Jersey P.L. 2019, c.120 (S477 SCS).

### Count VI
#### Section 2A:14-2a(a)(1) of New Jersey P.L. 2019, c.120 (S477 SCS)
#### NJLAD, N.J.S.A 10:5-12(e), et seq. and N.J.S.2A:14-2B
#### Aiding and Abetting
#### (against Defendant Elli Albert)

121.  Plaintiff incorporates herein by reference as if outlined in full the averments of paragraphs 1-120, inclusive, of this Complaint.

122.  As a result of the preceding, Elli Albert aided, abetted, incited, compelled, and coerced acts forbidden under the New Jersey Law Against Discrimination, §10:5-12(e) *et seq.*

123.  The New Jersey Supreme Court has held to establish NJLAD aiding and abetting liability against an employee, a plaintiff must show that "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation.' " Tarr v. Ciasulli, 181 N.J. 70, 84, 853 A.2d 921 (2004).  Simonetti v. Broadridge Fin. Sols., Inc., Civil Action No. 10-3903 (SRC), 2012 U.S. Dist. LEXIS 1550, at *31 (D.N.J. January 5, 2012).

124. ~~As the office administrator for Defendant Fox, Albert aided and abetted her employee, Siminoff, when she deliberately covered up, retaliated against, and terminated Ms. Jones after Ms. Jones complained about Siminoff's sexually explicit and harassing behavior. As the office administrator of Defendant Fox, Albert knew or should have known her acts were illegal and tortious when she retaliated against Ms. Jones. As evidenced in emails and written notes, Albert colluded with the accused to cover up Ms. Jones's complaints and chastised Ms. Jones out of making a big deal of Siminoff's unwanted sexual advances.~~

125. ~~The courts have recognized that even **_willful indifference or failure to act_** could expose a supervisor to NJLAD liability. See, e.g., Ivan v. County of Middlesex, 612 F. Supp. 2d 546, 553-54 (D.N.J. 2009). Here, the actions of Elli Albert go well beyond inaction. The direct evidence of Albert's express and overt hostility towards Ms. Jones's complaints of Siminoff's harassment, together with her instructing and colluding with Michael Barabander after Ms. Jones complained to her about Barabander's sexual harassment, certainly suffice to constitute "active and purposeful conduct" by Elli Albert to discriminate against Ms. Jones based on her sex and gender. Cicchetti, 194 N.J. at 595 (holding that "active and purposeful conduct . . . is required to constitute aiding and abetting" under NJLAD). Simonetti v. Broadridge Fin. Sols., Inc., Civil Action No. 10-3903 (SRC), 2012 U.S. Dist. LEXIS 1550, at \*32-33 (D.N.J. January 5, 2012).~~

126. ~~As a result of the preceding, Ms. Jones sustained, among other things, severe emotional distress, embarrassment, humiliation, physical pain, and mental anguish, together with shock, fright, and apprehension.~~

127. ~~Because of Albert's multiple acts of aiding and abetting, Ms. Jones is entitled to all legal and equitable remedies available under N.J.S.2A:14-2B, the NJLAD, and section 2A:14-2a(a)(1) of New Jersey P.L. 2019, c.120 (S477 SCS).~~

**~~Count VII~~**
***~~Section 2A:14-2a(a)(1) of New Jersey P.L. 2019, c.120 (S477 SCS)~~***
***~~New Jersey Law Against Discrimination~~***
***~~(against Defendant Fox Rothschild LLP)~~***

128. ~~Plaintiff incorporates herein by reference as if outlined in full the averments of paragraphs 1-127, inclusive, of this Complaint.~~

129.     New Jersey Supreme Court held that "the basic requirements for determining whether workplace acts of sexual harassment constitute prohibited discrimination under the LAD" were established in Lehmann. Cutler, 955 A.2d at 924.  Specifically, the New Jersey Supreme Court requires a plaintiff claiming a hostile workplace based on acts of sexual harassment to prove that the complained-of conduct (1) would not have occurred but for the employee's gender; and it was (2) severe or pervasive enough to make a (3) reasonable woman believe that (4) the conditions of employment are altered, and the working environment is hostile or abusive. Barroso v. Lidestri Foods, Inc., 937 F. Supp. 2d 620, 629 (D.N.J. 2013).

130.     Here, Ms. Jones is female.  As previously mentioned, Defendant Fox has a storied history of fostering a workplace where male workers have free reign to grope, prod, sexually harass, and sexually assault their female colleagues.

131.     If Ms. Jones were a man, Siminoff would not have sexually harassed and assaulted her, and Elli Albert would not have aided and abetted Seminoff's actions.

132.     Siminoff's actions were pervasive enough to make Ms. Jones believe the conditions of her employment were altered from a typical environment to a hostile and abusive environment where Ms. Jones had to endure unwanted touching, text messages of Siminoff's penis, and unwanted sexual advances.

133.     Defendant Fox's actions through its officers and agents evidence discrimination against Ms. Jones in connection to the terms, conditions, and privileges of her employment because of her gender, and retaliation against Ms. Jones for engaging in the protected activity of complaining of Siminoff's harassment in violation of the New Jersey Law Against Discrimination (the "NJLAD"), N.J.S.A. § 10:5-1 et seq, and section 2A:14-2a(a)(1) of New Jersey P.L. 2019, c.120 (S477 SCS).

134.     Fox's conduct was intentional, willful, deliberate, and in callous disregard of Ms. Jones's rights.

135.     Because of Fox's discrimination and retaliation, Ms. Jones is entitled to all legal and equitable remedies available under N.J.S.2A:14-2B, the NJLAD, and section 2A:14-2a(a)(1) of New Jersey P.L. 2019, c.120 (S477 SCS).

<u>**Count VIII**</u>
*<u>Section 2A:14-2a(a)(1) of New Jersey P.L. 2019, c.120 (S477 SCS)</u>*
*<u>Retaliation under Title VII and the New Jersey Law Against Discrimination</u>*
*<u>(against Defendant Fox Rothschild LLP)</u>*

136.        Plaintiff incorporates herein by reference as if outlined in full the averments of paragraphs 1-135, inclusive, of this Complaint.

<u>**Section 2A:14-2a(a)(1) of New Jersey P.L. 2019, c.120 (S477 SCS) NJLAD**</u>:

137.        The United States Court of Appeals for the Third Circuit has held that to establish a prima facie case for retaliation under the NJLAD, a plaintiff must plead that "(1) that she engaged in a protected activity; (2) that she suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse employment action." Davis v. City of Newark, 417 F. App'x 201, 202 (3d Cir. 2011). Gaines v. UPS, No. 2:13-3709 (KM) (MCA), 2014 U.S. Dist. LEXIS 51413, at *8 (D.N.J. April 14, 2014).

138.        Here, Ms. Jones is female and was qualified to execute the essential functions of her job with Defendant Fox.  As previously mentioned, Ms. Jones engaged in protected activity when she filed a complaint with Elli Albert on multiple occasions concerning the sexual harassment she faced at the hands of Siminoff and Barabander; and the sexual assault she experienced at the hands of Siminoff.

139.        Ms. Jones suffered an adverse employment action when she was terminated shortly after reporting Siminoffs sexual harassment and sexual assault to Defendant Fox's agent Elli Albert.

140.        The temper of proximity between Ms. Jones engaging in her protected activity of complaining about Siminoff's actions and Defendant Fox terminating her employment are so close that an inference of retaliatory intent is undeniable.

<u>**Title VII**</u>:

141.        "In the context of a Title VII retaliation claim, an adverse employment action is any action that could well dissuade a reasonable worker from making or supporting a charge of discrimination." Id.   "This definition covers a broader range of conduct than does the adverse action standard for claims of discrimination under Title VII." Id. "Protected activity for purposes of Title VII retaliation claims encompass an employee's complaint to supervisors about alleged unlawful activity, even if the activity turned out not to be

~~unlawful, provided that the employee had a good faith, reasonable belief that he was opposing an employment practice made unlawful by Title VII." Irons v. Bedford-Stuyvesant Cmty. Legal Servs., No. 13-CV-4467, 2015 U.S. Dist. LEXIS 130116, 2015 WL 5692860, at *19 (E.D.N.Y. Sept. 28, 2015). Isakov v. HASC Ctr., Inc., No. 17-CV-5775 (BMC), 2018 U.S. Dist. LEXIS 31624, at 18-19 (E.D.N.Y. Feb. 27, 2018).~~

142. ~~Here, Ms. Jones was advised to find another place to work other than Fox when she complained of Siminoff's abusive and predatory behavior. Shortly after that, Albert warned Ms. Jones not to put her complaints of Siminoff's harassment in email, as she did with her complaints of sexual harassment against Barabander. She was later terminated and informed that she had a great imagination when she raised the issue of retaliation due to Siminoff's sexual harassment.~~

143. ~~Fox's conduct was intentional, willful, deliberate, and in callous disregard of Ms. Jones's rights.~~

144. ~~Because of Fox's discrimination and retaliation, Ms. Jones is entitled to all available legal and equitable remedies under Title VII, the NJLAD, and section 2A:14-2a(a)(1) of New Jersey P.L. 2019, c.120 (S477 SCS).~~

## JURY DEMAND

Ms. Jones demands a trial by jury as to all issues so triable.

## PRAYER FOR RELIEF

Wherefore, Plaintiff, Stephanie Jones, respectfully prays that the Court:

a. adjudge, decree, and declare that defendants have engaged in illegal gender discrimination and retaliation and that the actions and practices of defendants complained of herein are violative of her rights under Title VII, the NJLAD, and section 2A:14-2a(a)(1) of New Jersey P.L. 2019, c.120 (S477 SCS);

b. order defendant Fox to provide appropriate job relief to Ms. Jones;

c. enter judgment in favor of Ms. Jones and against defendants for all available remedies and damages under law and equity, including, but not limited to, back pay, front pay, past and future mental anguish and pain and suffering, in amounts to be determined at trial;

d.  order defendants to pay the attorney's fees, costs, expenses, and expert witness fees of Ms. Jones associated with this case;

e.  grant such other and further legal and equitable relief as may be found appropriate and as the Court may deem just or equitable;

f.  and retain jurisdiction until the Court is satisfied that defendants have remedied the unlawful and illegal practices complained of herein and are determined to be in full compliance with the law.

Date: ~~October 01, 2021~~
        September 20, 2022

Tyrone A. Blackburn, Esq.
T.A. Blackburn Law, PLLC
1242 E. 80th Street, 3rd Floor
Brooklyn, NY 11236
Tel: 347-342-7432
TBlackburn@TABlackburnlaw.com
Attorney for Stephanie Jones